Glen Earl **GRIGG,** Appellant,

v.

**SOUTHERN PACIFIC COMPANY,** a Corporation, Appellee.

No. 15220.

United States Court of Appeals Ninth Circuit.

June 28, 1957.

Rehearing Denied Oct. 25, 1957.

**614**

Barnett & Robertson, Rodney H. Robertson, San Francisco, Cal., Charles J. Miller, Sacramento, Cal., for appellant.

Devlin, Diepenbrock & Wulff, Horace B. Wulff, Sacramento, Cal., for appellee.

Before LEMMON, FEE and CHAMBERS, Circuit Judges.

CHAMBERS, Circuit Judge.

Some of H. L. Coon's mules were loose on a freeway, U. S. Highway No. 40, in the westerly suburban area of Sacramento on December 17, 1954. Shortly after six in the evening, it was already dark, Glen Earl Grigg, alone and eastbound in his new Cadillac, collided with two of the mules. At least one mule was killed,[1] the Cadillac was badly damaged, and Grigg suffered some injuries. Although Grigg was driving about 50–55 miles per hour when he first saw the mules a very short distance in front of him, it has been determined that he was free from negligence both in his speed and in his conduct in the emergency.

The mules on the freeway were part of a shipment of 57 mules and horses which had arrived on December 16 in two stock cars via Southern Pacific freight at the railroad's Washington corrals in West Sacramento.[2] There Coon,[3] the consignee, had unloaded the livestock from the cars into the wooden fenced corrals of Southern Pacific under the supervision (or at least checking) of one Anthony Perine, a company clerk. The latter regularly attended unloadings at the pens and made the customary count of animals and check of their physical condition for injuries.

This particular shipment of horses and mules had originated at Texarkana, Texas, on the Texas and Pacific Railway on December 9. The shipment was made under a uniform livestock contract between the originating carrier and one Haas Owen, shipper, at Texarkana. In the contract (and in the freight waybills for the two cars as originally prepared) Sacramento was given as the destination. The animals traveling under a low tariff, were destined for slaughtering in California for poultry feed. Thus, the animals in transit had the unlovely title of "chicken" horses and mules.

The shipment was not accompanied by a drover. The cars passed on to the lines of the Santa Fe railroad at Sweetwater, Texas. Santa Fe carried them to Bakersfield, California, where Southern Pacific picked them up and moved them to Sacramento. At intermediate points all three railroads had removed the animals at pens where presumably they were watered and fed. These were rest stops.

Until the afternoon of December 18, the horse and mule shipment had no other destination than Sacramento. On December 16 and 17 the shipment as originally ordered was complete. But the applicable tariffs filed with the Interstate Commerce Commission provided that within 20 days after arrival at the first destination the livestock could be reshipped to a second destination. At

---

1. Simultaneously one Spansel in a light pick-up truck alongside of Grigg collided and killed another mule. It appears that in this double accident a total of two mules were killed. A third one was badly lacerated by either Grigg or Spansel.

2. The Washington corrals were about one and a half miles from the scene of the collision.

3. Coon's name is rather flexible. Sometimes he is H. L. Coon. Again he is called H. L. Coons. In the pleadings herein he is named as Harver Coon Gendel.

Sacramento, on December 18, Coon filed with Southern Pacific a diversion or reshipment order to Santa Rosa, California.[4] The two cars were promptly reloaded with the 55 animals remaining and then the cars went out of Sacramento and eventually over the lines of the Northwestern Pacific to Santa Rosa. The cars arrived at their final destination on December 19. Three days later, on December 22, a certificate was filed that all of the remaining animals had been slaughtered.

We must now return to the Washington corral at Sacramento. There is no doubt that when the mules arrived on December 16 Coon immediately "took charge." Perine for the railroad was there at the unloading. His entry in the railroad stock book for this occasion says, "Unloaded by owner, counted by me, not called by 12th Street (meaning the yard office), happened (while off duty) to see stock pass (in the cars on the way to the corrals.)" About 10:00 a. m. the next morning Perine again went to the corrals. At that time Coon had the animals outside of the regular wooden corrals but within a contiguous area which for a portion of its perimeter had a rather flimsy wire fence. Here the animals were being fed. In this feeding that morning, Coon had been assisted by another stock buyer named Courtney. Perhaps, the reason for this feeding outside was that the regular corral was quite muddy. Who originally put the wire fence up no one knows. This wire pen had been in place long enough for Southern Pacific to know about it. All or part of it had been erected by Coon some months before. Although troughs up off of the ground were available inside the regular pens, there may have been a problem of getting the feed through the mud to the troughs.

Perine was back again past the stockyards about 3:45 p. m. on his way to commence his evening 4:00 p. m. to midnight shift. At that time it would appear the animals were all in the outside wire pen, or at least most of them. Coon was there watching.

Next in point of time, at just about 5:30 p. m., we find California Highway Patrolman George Houck running around the freeway area looking for mules near the place where the collision happened 40–45 minutes later. He testified that he found a deputy sheriff had some mules "corraled" near the freeway and that he saw some mules loose on the freeway. After the accident, too, Houck was "chasing mules." (Houck suggests that the accident may or may not have been caused by the mules that the deputy sheriff had corralled.)

Apparently sometime after the accident Coon appeared in the area and was busy "rounding up" animals.[5] Late in the evening (after 9:00 p. m.) Perine was in the area looking for loose animals. He found none. The next morning, assisted by another Southern Pacific employee, R. L. Duke, Perine did find three more horses or mules which he took or drove to the corral. The next morning Coon was at the corral and all horses and mules were inside the wooden corral after Duke and Perine brought in the three loose animals.

On May 27, 1955, Grigg filed in the Superior Court of the State of California, in and for the County of Sacramento, a complaint for damages. He named as defendants Coon, the Southern Pacific Company and "First to Sixth Doe, Inclusive." The burden of the negligence charge was:

"That on or about the said 17th day of December, 1954, at about the

4. The railroad's stock book shows that the remaining animals (55) were reloaded at 5:00 p.m., December 18. Its clerk, Duke, made the following narrative entry in the books: "Horses escaped from corrals, ran on Yolo freeway and two killed by autos, turned over to reduction. One had

bad larceration on front shoulder when corralled."

5. Patrolman Houck after the accident and sometime during the evening of December 17, saw Coon and issued him some kind of a citation for letting the animals "escape."

hour of 6:15 o'clock p. m., the said defendants, and each of them, owned, possessed and controlled, and had in their sole care and custody certain mules or horses in the immediate vicinity of said Park Overpass, U. S. Highway 40, approximately one mile west of Sacramento, California, *and were so negligent, careless and reckless in their said care, custody and control, ownership and maintenance of said horses and mules* as to allow said animals to stray or come upon the said Park Overpass on U. S. Highway 40 and into and upon the main traveled portion of said highway, and into the path of the plaintiff's oncoming car, and that at said time and place, the car of plaintiff was caused to be struck by one or more of said horses or mules with great force and violence, severely damaging the automobiles of plaintiff and causing plaintiff to sustain the personal injuries hereinafter set forth." (Emphasis supplied.)

Plaintiff sought to recover for his property damage, medical expense and his own personal injuries. He had had little obvious injuries at the outset, but he claimed that there were serious resulting injuries evident later, particularly to his teeth and hip. He was damaged in his property and his person by the collision. How much he was damaged is not a problem here.

Coon was never served, he having already left for Arkansas. The record would indicate he has not been heard of since. No one ever had the benefit of his testimony.

Before the appointed date for trial in the state court there had been certain discovery procedures participated in by both parties. On the day of the trial, Coon and the Does not yet being before the court, Southern Pacific moved swiftly with a petition in the United States District Court for the Northern District of California for removal of the cause. That removal plaintiff has fought unsuccessfully and we must consider it later herein. Then more details will be stated.

In the district court the pleadings were never amended except as to the allegation of damage. No pre-trial conference was ever held. The mat on which the parties mainly fought to establish or deny liability was a quilt formed by the shipping documents and excerpts from statutes which they considered applicable.

The case was judge tried. After the evidence of plaintiff was completed the defendant moved for judgment. Eventually this was granted. The district court was of the opinion that the control and possession of the animals was in Coon on December 17, the day of the collision and not in Southern Pacific. In its findings the court said:

"That upon their arrival at the siding adjacent to the wooden corral of the defendant, Southern Pacific Company, at West Sacramento, California, said H. L. Coon, as the owner of said horses and mules and the consignee of said shipment, unloaded said horses and mules from said cars into said corral, watered them, fed them and took the exclusive custody and possession thereof; that from and after the arrival of said two (2) cars of horses and mules in West Sacramento, State of California, at or about the hour of 10:30 o'clock a. m. on the 16th day of December, 1954, (at which latter date the said H. L. Coon executed an order of diversion pursuant to which said shipment was reloaded and carried to Santa Rosa, California, the defendant, Southern Pacific Company had no possession and/or control of said horses or mules but, to the contrary, the sole and exclusive care, custody, control, ownership and maintenance of said horses and/or mules was with said consignee and owner, to wit, H. L. Coon.

"That on the 17th day of December, 1954, at or about the hour of 6:15 o'clock p. m. of said day the

plaintiff, Glen Earl Grigg, was operating his 1955 Cadillac automobile sedan in a general easterly direction on said Park overpass, U. S. Highway 40, and about one (1) mile west of Sacramento, California, and that while said horses and mules were in the exclusive care, custody, control, ownership and/or maintenance of H. L. Coon the latter, without any participating act or omission by defendant Southern Pacific Company, negligently and carelessly permitted or allowed said horses and mules to stray or come upon said Park overpass on said U. S. Highway 40 and into the path of plaintiff's oncoming car and at said time and place the car of plaintiff was caused to be struck by one or more horses or mules, damaging said car of plaintiff and causing plaintiff to sustain certain personal injury of undetermined nature and extent."

Further, Grigg was found free from negligence. We think the necessary corollary of the entire findings would be that Coon was keeping and feeding his horses and mules on Southern Pacific property as a licensee.

There is no evidence that the plaintiff tried to relieve himself of his self-imposed limitation that the Southern Pacific Company was "negligent in its custody and control," [6] of the horses: no indication that the case was tried on any theory in whole or in part different from the pleadings. We do not reach what the case might have been if plain-

tiff had sought to establish liability on a theory as follows:

1. That the railroad furnished a licensee, Coon, an unsafe place to keep the livestock or knew that he would use an unsafe place, to-wit: the outside wire pen.

2. That the horses and mules broke out of the inadequate wire pen and thence made their way to the highway causing plaintiff's collision and damage.[7]

Perhaps on such a proven claim, under California law, (we do not say) there might have been some liability. If the providing of an inadequate wire pen (or indulging its use) caused the accident, maybe there was a violation of a duty owed the public over on Highway 40.[8] But in this lengthy speculative field, we find one more problem. The trial court found, as noted above, that Coon "negligently and carelessly permitted or allowed said horses and mules to stray or come upon * * * U. S. Highway 40 * * *" Unless the court was using res ipsa loquitur as against Coon we cannot see how anyone could have concluded with reasonable confidence in his own determination just how the mules did escape. Live horses and mules are volatile things. Did Coon remain at the corral after 3:45 p. m. (when he was last seen there before the accident) on December 17 until they "escaped?" Were the animals left unattended in the wire pen or in the wooden corrals?[9] Did they push over a wire fence or get a gate on the wooden

---

**6.** *After judgment, Grigg moved in writing for a new trial and for amended findings. Two months later the district court denied the motion for a new trial and for amended findings. In the same denial order one finds: "And it is further ordered that plaintiff's motion to amend complaint to conform to evidence be, and the same is, hereby denied." We find in the record no such motion.*

**7.** Here in support of such a theory appellant aptly cites Section 318, Restatement of Torts, and some Pennsylvania cases; also California cases which might have a bearing.

**8.** Plaintiff here as appellant does get around to making the contention that as licensor the carrier owed a duty to the public which was breached, but there is no evidence in the printed transcript that the issue was presented in the trial court.

**9.** The condition of inanimate things is usually presumed to continue for a time at least. Not knowing, would we presume that Coon did or did not leave the corrals after 3:45 p. m.? If we assume he left, would we presume he permitted the mules to remain in the wire pen, or that he put them back into the strong contiguous corral into which there was a gate from the wire pen?

corral open? Were they excited by some stranger and caused to bolt? Could children have opened a gate?

It is no evidence whatsoever of what happened but, in one's curiosity as to what happened, the nearest thing one can find for an explanation may be in counsel's attempt to prove by the witness Courtney that Coon (when the animals had been mostly re-collected after being at large) had said to Courtney that he, Coon, had put the animals back in the corral (one would assume the wooden corral) and "that the animals must have escaped from the corral, or some children must have let them out."

■ We must now address ourselves to the crucial question of Grigg's appeal from the adverse judgment he received. On December 17, in whose possession, custody or control were the horses and mules?[10] The trial court has found: Coon. We think the finding was the only one possible under the evidence.

Both parties find help in the documents.[11] Here on December 17, on the record, the carriage bargained for at Texarkana was complete. True, railroad tariffs still permitted Coon to make a different carriage contract. But on the day of the collision Coon, who had the animals, had not entered into this supplemental contract. On that day, the livestock was going nowhere. Coon might have taken the livestock away forever, which on other shipments to Sacramento he had sometimes done. He

might have taken the animals far away from the Southern Pacific corrals and brought them back within 20 days and reshipped under the intransit provision of the tariff. If the remaining 55 animals had never been reloaded and shipped on to Santa Rosa, under our facts it is not likely that anyone would say that Coon's custody and control at the West Sacramento yards was the railroad's. While it is inescapable in legal decisions that fine lines must be drawn, we cannot believe that here, without more, Coon's subsequent execution of a diversion order, the consequent reloading and shipment including resumption of the carrier's custody, fastened a liability which did not exist before the diversion order came into being and made a different contract. The diversion order did not make the possession run backwards. As against the public, outside the express contract, the animals could have been in the carrier's custody if the consignee had not actually taken charge of them or if he had returned the care of the animals to the carrier. All the evidence points to a surrender of control by the carrier from arrival, December 16, to diversion and departure, December 18. Both on a contract basis and a factual basis of actuality, we conclude the findings of fact on custody, possession and control were correct.[12]

It may be well to point out some of the things this case is not, in addition to some of the points already indicated as

---

10. Appellant cites California Agricultural Code, § 422 and § 423, and 45 U.S.C.A. § 71 and § 72. These sections beg the question until it is first decided in whose possession or control the animals were at the time they "escaped."

11. (a) The shipping contract provided that the shipper would load and unload the stock, except where the carrier was obligated to do so by statute or a tariff.

(b) The freight waybills, until the diversion order was executed by Coon, showed Sacramento as the destination of the two cars. After the diversion order, the waybills were altered by striking out "Sacramento" and inserting "Santa Rosa, Calif." Therefore the waybills finally

read, "From Texarkana, Texas, to Santa Rosa, Calif."

(c) Southern Pacific's applicable I.C.C. tariff for the diversion (Correction No. 603, issued September 5, 1952, and effective October 10, 1952,) provided: "(J) The custody and possession of livestock while feeding, watering, resting, sorting and/or consolidating shall be that of the owner and not of the carrier."

12. This being a diversity case, California law applies. The defendant relies heavily on Rutherford v. Reilly, 104 Cal.App.2d 629, 232 P.2d 34. The case certainly buttresses defendant's position, but would not be conclusive if the animals were actually in the carrier's control, or legally supposed to be in its control.

without its purview. We mention as variations of the facts:

1. Suppose this unloading at Sacramento had been just a required en route rest stop, attended by the carrier's men alone, attended by the consignee alone, or both carrier and consignee attended and participated.

2. Suppose prior to the collision Coon had executed a diversion order for Santa Rosa.

Such questions we do not answer.

We are not convinced that the probable "over finding" that Coon "negligently and carelessly permitted said horses and mules to escape" blights an otherwise correct result.[13]

■ We must now return to the subject of the removal of the case from the superior court where it was filed to the United States District Court for the Northern District of California. Plaintiff steadfastly holds on to this point. We recall that the defendant Coon was never served. First Doe to Sixth Doe, Inclusive, were never served. The original complaint said of the Does: "Plaintiff does not know the true names of the defendants designated herein by the fictitious names of the First Doe to Sixth Doe, inclusive, and plaintiff prays leave to substitute their true names when the same become known to him and to substitute appropriate charging allegations concerning said fictitiously designated persons."[14] It is fair to say, as of filing, the Does were wholly fictitious. They were not aliases selected by the plaintiff for actors in the events related

in the complaint. Nothing is charged in the original complaint involving the participation of the Does.

The case as it stood in the state court came on for trial in Sacramento on November 15, 1955. The day opened with the court commencing to consider plaintiff's previously filed motion to amend his amount of claimed damage. During the colloquy over that motion, plaintiff when queried as to the status of Coon moved to dismiss as to Coon. The motion was granted. Immediately Southern Pacific's attorneys announced they were operating on another front simultaneously. They said they were at the moment, in view of the newly developed change of status of parties, filing in the nearby federal court in Sacramento a removal petition on the basis of diversity of citizenship. Grigg's counsel, both surprised and indignant, objected in the state court that defendant couldn't remove. In protest, they submitted the following reasons:

1. The defense had known for a month that plaintiff on the trial date would dismiss as to Coon. Plaintiff's counsel had so advised them orally.

2. The defendant had answered, had taken depositions, and at the deposition hearings had entered into trial stipulations. The defendant had used the court's compulsory processes.

3. The Does were still in the case. Therefore, the necessary diversity was yet lacking.

Copies of the removal papers from the United States court were soon produced.

13. Since the 1935 amendment to § 423 of the Agricultural Code of California this court has made the obvious ruling that res ipsa loquitur is not to be used in a case like Grigg's. Galeppi Bros. v. Bartlett, 9 Cir., 120 F.2d 208, 209. In Galeppi we found there was evidence of negligence in the care and control of a cow. The prevailing findings in Grigg's case were prepared by carrier's counsel upon direction of the court. They are just as binding after approval as if they were the judge's own work. But still this court can speculate about them parenthetically. Did the trial court have its mind on the

finding the "escape" was due to the negligence of Coon? Did defendant's counsel "overserve" his client when the finding was proposed to the court? Naturally, defendant wanted to push any blame at any point away from its doorstep.

14. The complaint, as filed in the state court, said plaintiff Grigg and defendant Coon were residents of California. Southern Pacific was alleged to be incorporated under the laws of Delaware. No residence was alleged for the Does. The removal petition said Grigg was a citizen of California and Southern Pacific a citizen of Delaware.

The state judge announced he no longer had jurisdiction to do anything. Plaintiff's counsel, however, moved that the "matter be put over for thirty days for the purpose of allowing us to serve summons by substitute process upon persons who are at the present time unknown." The state judge correctly commented, "You don't allege these John Doe defendants are residents any place * * * and these defendants are fictitious defendants and are sued under these fictitious names and there are no charging allegations against the Does."

The state court heard out the plaintiff but neither took or attempted any action on plaintiff's motion to amend his complaint or for a continuance. A simple order was then entered putting the case off calendar.

Promptly in the United States district court plaintiff moved to remand. The motion was denied. We hold the ruling was right. The matter is settled by our decision in Southern Pacific Co. v. Haight, 9 Cir., 126 F.2d 900.[15] In Haight the complaint joined two employees of the company under fictitious names alleging they were residents of California. Trial day came and no defendants had been served or identified. There, as the trial opened, plaintiff announced, "Ready." Forthwith defendant proceeded to remove to the federal court. The state court proceeded to "unset" the case and one railroad employee was quickly served (he answered) and tagged with one of the fictitious names. In Haight there were charging allegations against the Does. This was not enough.

Grigg's position is weaker than Haight's. We suggest not that Grigg deceived or attempted to deceive. But legally his Does were a sham. He never attempted to identify or charge a Doe until he found he was in trouble—his case was going to a court where he preferred not to go. This was too late. In extremis, but in candor, he prayed for time in which he could go out and find a Doe. Perhaps these Does have some proper place under California state practice. But it is hard to believe they serve any purpose when they are included superstitiously and without reason. Certainly their phantoms, when Does live not and are accused of nothing, should not divert the course of justice. What we say here is another phase, the other side of the coin, of what we have said in Molnar v. National Broadcasting Co., 9 Cir., 231 F.2d 684 and Roth v. Davis, 9 Cir., 231 F.2d 681.

We are impelled to make a comment about this case independent of any point suggested by the parties or the trial court. We allude to "pre-trial." Of course, pre-trial will reach its ultimate success when the trial judge and lawyers believe in it, and, believing in it call for it.

This was a case where it would have conserved everyone's time. A pre-trial conference might have pointed up the advantage of trying the issue of custody and control separately. The trial judge might have been spared the highway patrolman's voluminous testimony which he (the judge) found not untruthful, but highly unsatisfactory. We note at the beginning of the trial, the judge wanted a map of the area and didn't consider photographs of a snatch here and a patch there satisfactory. Probably proceeding as best they could in the middle of a trial, counsel eventually produced a map. By then some of the witnesses who would have used the map had already testified. The transcript indicates the trial judge is an extremely busy one. In this case he could have reached a correct result in less time.

Affirmed.

15. At the time of Haight's case under the federal removal statute the first step to remove was the filing of a removal petition in the state court with ultimate determination of the right in the federal court. By amendment in 1948 the procedure was changed. Now the initial removal petition is filed in the United States district court. See 28 U.S.C.A. § 1446 and notes thereto.