Billie J. PREASEAU, Plaintiff-Appellant,

v.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant-Appellee.

No. 77-1665.

United States Court of Appeals, Ninth Circuit.

Feb. 15, 1979.

Mark G. Steidlmayer (argued), of Trezza, Ithurburn, Steidlmayer & Bower, Yuba City, Cal., for plaintiff-appellant.

Forrest A. Plant (argued), of Diepenbrock, Wulff, Plant & Hannegan, Sacramento, Cal., for defendant-appellee.

Before CHOY and SNEED, Circuit Judges, and KERR *, District Judge.

CHOY, Circuit Judge:

Billie Preaseau, plaintiff below, appeals from the district court's denial of her motion to remand to state court her action removed to federal court at the instance of Prudential Insurance Company of America (Prudential), defendant below. Preaseau also appeals from the federal district court's granting of Prudential's motion for summary judgment. We affirm.

I. *Statement of the Case*

On January 1, 1970, Prudential issued two group insurance policies to Amelco Corporation. These policies were a "Term Life Policy" which provided life insurance coverage in the amount of $30,000, and a "Personal Accident Policy" which provided for, among other benefits, accidental death benefit in the amount of $100,000. As an employee of a subsidiary of Amelco Corporation, Jesse Preaseau received a certificate indicating his status as an insured under the Amelco group policies. Jesse Preaseau designated his wife, appellant Billie Preaseau, as his beneficiary.

On June 1, 1973, Jesse Preaseau voluntarily terminated his employment with Amelco. Except for the notice in his certificate, he was not given notice of his right to convert his group life insurance coverage to individual coverage. He did not at any time ask to convert it to individual coverage.

Ninety days after his termination of employment, Jesse Preaseau died an accidental death in an automobile accident. Shortly thereafter, Prudential paid to appellant Billie Preaseau the sum of $30,000 plus interest as the beneficiary under the Term Life Policy. Prudential refused to make any payments under the Personal Accident Policy, contending that Jesse Preaseau's coverage ceased upon his termination of employment.

Billie Preaseau filed suit in California state court on June 10, 1974, seeking recovery of benefits under the Personal Accident Policy. Her complaint named as defendants Prudential, Amelco Corporation, Amelco Industries, a wholly-owned subsidiary of Amelco Corporation, and Doe I through Doe X. Following some discovery, Prudential unsuccessfully moved for summary judgment. On July 25, 1974, all the named defendants except Prudential were dismissed.

At the state court's pretrial conference on May 6, 1976, Prudential requested that either the fictitious defendants be dismissed or that the trial scheduled for May 18, 1976, be continued. Prudential's request was denied. On the morning of May 18, 1976, the fictitious defendants were dismissed. Prudential's attorneys thereupon requested a recess. After the recess they announced that they had filed a petition for removal of the action in the United States District Court for the Eastern District of California. The state court took no further action.

* The Honorable Ewing T. Kerr, Senior United States District Judge for the District of Wyoming, sitting by designation.

Billie Preaseau filed a motion in federal district court for remand of the action to California state court. This motion was denied. On February 4, 1977, the federal district court granted Prudential's motion for summary judgment. From these two rulings Billie Preaseau appeals.

## II. *Removal*

■ 28 U.S.C. § 1441(b) provides:

Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. *All other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.*

(emphasis added). 28 U.S.C. § 1446(b) defines the time limitation for petitioning for removal:

The petition for removal of a civil action . . . shall be filed within thirty days after the receipt by the defendant . . of a copy of the initial pleading setting forth the claim for relief . . . or within thirty days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter. If the case stated by the initial pleading is not removable, a petition for removal may be filed within thirty days after receipt by the defendant . . . of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable.

Appellant Preaseau argues that Prudential's petition to remove was untimely and that the matter should therefore have been remanded to state court upon Preaseau's motion. She contends that the Doe defendants named in her complaint should be ignored for the purposes of determining removability because they had not been served, so that the initial complaint manifested removability. Because Prudential's petition was filed more than 30 days after receipt of the complaint, Preaseau concludes it was untimely. Prudential counters that it could not ascertain the existence of the required diversity until after the dismissal of the Doe defendants because of the possibility that one or more of the Doe defendants would destroy the required diversity.

Our decision in *Southern Pacific Co. v. Haight,* 126 F.2d 900 (9th Cir.), *cert. denied,* 317 U.S. 676, 63 S.Ct. 154, 87 L.Ed. 542 (1942), compels the conclusion that Prudential's petition was timely. There a California citizen filed suit in California state court against Southern Pacific, a Kentucky corporation, and two fictitiously-named employees of Southern Pacific, alleged to be California citizens. By the time the case was called to trial, the fictitious defendants had not been served and had not made any appearance in court. When the plaintiff announced that she was ready to proceed to trial without serving the two fictitious defendants, Southern Pacific filed a petition for removal. It claimed that by proceeding to trial without serving the two fictitious defendants, the plaintiff had agreed to sever her claims against Southern Pacific from those against the fictitious defendants and therefore the required diversity existed. The next day the plaintiff served one fictitious defendant. The district court found removal jurisdiction.

We held that removal was proper. We noted that by acknowledging readiness to go to trial when the fictitious defendants had not been brought into court, the plaintiff severed her Southern Pacific claims and the required diversity existed. *Id.* at 904. We then addressed the timeliness of the removal. Noting the policy of encouraging removal as soon as possible, we wrote:

[I]n *Pullman Co. v. Jenkins* [, 305 U.S. 534, 59 S.Ct. 347, 83 L.Ed. 334 (1939)] . . . the fact of non-service of the resident defendant was not a sufficient ground for removal, and it was therefore not until the plaintiff took some affirmative action to sever the cause of action that the right

to remove the cause arose. The petition to remove was made immediately after the plaintiff announced herself ready to proceed with the trial against the Southern Pacific Company alone, and was therefore timely. The fact that the resident defendant was not served or would not appear at the time set for trial would not of necessity be known to the non-resident defendant and therefore his right to remove could not be denied because he did not move for the severance upon his being served with notice of setting the case for trial.

However, the fact that plaintiff had the case set for trial, knowing that the resident defendant had not been served and appeared in court with such knowl-edge and answered that she was ready for trial is conclusive evidence that she regarded the action as severed . . . .

*Id.* at 905.

*Haight* thus established that a defendant's petition for removal is timely when made immediately after fictitious defendants are no longer part of the action and therefore can no longer destroy the required diversity. *See Self v. General Motors Corp.,* 588 F.2d 655, 659 & n. 5 (9th Cir. 1978). In the present case, as in *Haight,* Prudential sought removal as soon as the Doe defendants were no longer part of the action, here because of dismissal.[1] *Haight* thus compels the conclusion that Prudential's petition was timely.[2]

---

1. The record indicates that Preaseau is a citizen of California and Prudential is a New Jersey corporation.

2. *Grigg v. Southern Pacific Co.,* 246 F.2d 613 (9th Cir. 1957), also involved the question of removal where there were fictitious defendants. There plaintiff filed suit for personal injuries in California state court against Southern Pacific, H. L. Coon, and six Doe defendants. Not having served Coon by the day of trial, plaintiff successfully moved to dismiss Coon. Immediately thereafter, Southern Pacific sought removal. Plaintiff contended that the continued presence of the Does prevented the establishment of the necessary diversity. But this court affirmed the district court's refusal to remand the case to the state court:

The matter is settled by our decision in . . . *Haight* . . . . In *Haight* the complaint joined two employees of the company under fictitious names alleging that they were residents of California. Trial day came and no defendants had been served or identified. There, as the trial opened, plaintiff announced, "Ready." Forthwith defendant proceeded to remove to the federal court. . . . In *Haight* there were charging allegations against the Does. This was not enough.

Grigg's position is weaker than Haight's. . . . [L]egally his Does were a sham. He never attempted to identify or charge a Doe until he found he was in trouble—his case was going to a court where he preferred not to go. . . . Certainly their phantoms, when Does live not and are accused of nothing, should not divert the course of justice. *Id.* at 620.

Some district courts have viewed *Grigg* as limiting *Haight.* They read the latter paragraph quoted as meaning that when Doe defendants are unidentified and indefinite, the de-fendant must file for removal within thirty days of the complaint. But when the Does are sufficiently identified, then the *Haight* rule applies. For example, in *Herrera v. Exxon Corp.,* 430 F.Supp. 1215 (N.D.Cal.1977), the court wrote:

[D]efendant Exxon counters that the two lines of cases allow a defendant two alternatives. Where the citizenship of Doe defendants is in doubt, he may take immediate steps to remove the action to federal court by demonstrating that the unidentified parties are but formal and unnecessary defendants, or he may wait to remove until the plaintiff takes some affirmative action indicating his intention not to proceed against unidentified defendants. [Citation omitted.]

The Court agrees that a defendant does have such an option when a plaintiff pleads with particularity against Doe defendants, as was done in . . . *Haight* . . . .

However, a defendant enjoys no such option when unidentified defendants are rotely included in the complaint. The rationale for this distinction is simple. Although actions which entail specific averments against adequately described, fictitious defendants are not removable as filed if the citizenship of the Does is in doubt, those which include unnamed defendants without apparent reason are removable if diversity between the named parties is clear and, must, therefore, be removed within the first thirty-day period allowed by 28 U.S.C. § 1446(a). [*Grigg.*]

*Id.* at 1218–19. *See Jong v. General Motors Corp.,* 359 F.Supp. 223, 226 (N.D.Cal.1973).

We believe that the district courts have misread the *Haight-Grigg* line of decisions in making a distinction according to the degree of identification of Does in complaints. The *Grigg* court specifically stated that it found *Haight* controlling. As in *Haight,* in *Grigg* plaintiff stood ready to proceed to trial without serving

Preaseau retorts that § 1441(b) means that in determining diversity, Prudential could have ignored the Does and thus the petition was untimely. Citing the language of § 1441(b) about "parties in interest properly joined and served as defendants," Preaseau contends that all persons who are not "properly joined and served" are irrelevant in determining diversity. Preaseau concludes: "Clearly within . . . § 1446(b) PRUDENTIAL could have sought removal notwithstanding the presence of the fictitious defendants because the fictitious defendants had not been served."

Preaseau's argument is contrary to the conclusion in *Haight* that the presence of fictitious defendants prevented the finding of diversity until they were severed from the Southern Pacific suit. Moreover, this court has specifically rejected the contention that § 1441(b) implies that service is the key factor in determining diversity. In *Clarence E. Morris, Inc. v. Vitek*, 412 F.2d 1174 (9th Cir. 1969), plaintiff, a California

corporation, filed suit in Nevada state court against a California citizen and a Washington corporation. The Washington corporation successfully sought removal to federal court. At the time the federal court assumed jurisdiction the California citizen had not been served; the California citizen was served before the federal court heard a motion to dismiss. The district court held, *inter alia,* that even though the one defendant was a California citizen, because he had not been served his citizenship could not destroy the required diversity. We reversed, writing:

> A nonresident defendant cannot remove a "non-separable" action if the citizenship of any codefendant, joined by the plaintiff in good faith, destroys complete diversity, regardless of service or nonservice upon the codefendant . . . . .

*Id.* at 1176. We then explicitly rejected the argument that "§ 1441(b), by implication, expanded removal jurisdiction to permit re-

---

or naming the Does, thus indicating severance of the fictitious defendants from the Southern Pacific trial. Though the court also indicated that *Grigg* had an even weaker case than *Haight* because of the sham nature of the Does, the *Grigg* court did not purport to limit *Haight* according to the degree of identification of the Does.

Our conclusion is reinforced by two factors. First, as the court in *Herrera* acknowledged, the bifurcated rule it postulates is one of "the degree of generality with respect to Doe defendants which renders an action removable on the pleadings." 430 F.Supp. at 1219. Although the court there expressed some doubts as to the importance of removal jurisdiction, *id.* at 1220, as long as Congress continues to provide for such jurisdiction, we do not believe that a defendant's right to choose forums under some circumstances should be determined by whether he successfully guesses in which branch of the bifurcated rule the "degree of generality with respect to Doe defendants" places him. This is particularly so because it is the plaintiff who draws up the complaint.

Second, although we appreciate the delaying effect of removal jurisdiction, congressional provision of such jurisdiction necessarily implies acceptance of the delay. Moreover, we perceive no danger of undue prejudice to the plaintiff, for he can determine when the 30 day period of § 1446(b) begins running through his decision whether to name Doe defendants, to specify their citizenship, or to dismiss them promptly.

Professors Wright, Miller, and Cooper view the "sham" language in *Grigg* as meaning that the federal courts will not allow federal diversity jurisdiction to be destroyed by the improper and unwarranted use of Doe defendants. Citing *Grigg* they write: "[S]everal courts have upheld removal when it was clear that no real claim was being asserted against the unnamed defendant." 14 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3642, at 126 (1976). Because neither appellant nor appellee claims that the Does were obviously "phantoms" (Preaseau in her pleadings identified them as "the agents/employees of the remaining defendants"), or that appellant included the Doe defendants as a sham to defeat diversity jurisdiction, this case does not raise the question of whether clearly "sham" and "phantom" Doe defendants would have to be disregarded in applying *Haight*. *See Sykes v. United States,* 290 F.2d 555, 556 (9th Cir. 1961); *Molnar v. National Broadcasting Co.,* 231 F.2d 684, 687 (9th Cir. 1956); *Roth v. Davis,* 231 F.2d 681, 683 (9th Cir. 1956). We also need not consider whether a plaintiff would be equitably estopped from arguing that the sham of his or her joining of Doe defendants was so obvious as to prevent invocation of *Haight*. We conclude only that *Grigg* did not engraft upon *Haight* a bifurcated test of timeliness dependent upon the degree of specification of the identity of the Doe defendants.

moval, despite want of diversity, if a resident defendant whose presence would defeat diversity had not been served." *Id.* at 1176 n.1.

Appreciating the impact of *Clarence E. Morris,* Preaseau seeks to distinguish it by noting that it involved an unserved *named* defendant while here there is an unserved *fictitious* defendant. But that decision did not turn on the distinction between named and fictitious defendants. It stated a general rule fatal to Preaseau's claim: diversity is determined by the "citizenship of any codefendant, joined by the plaintiff in good faith."

Preaseau argues finally that it is unfair to allow Prudential to wait until the day of trial to seek removal.[3] But Preaseau forgets that it was she who determined to name Doe defendants who might destroy diversity, that it was she who determined not to provide in her complaint the necessary allegations which would have allowed Prudential to ascertain diversity, and it was she who determined that the Doe defendants would not be dismissed until the day of trial. Thus she, and not Prudential, controlled when the 30 day time limit of § 1446(b) would begin running. We affirm the district court's refusal to remand to the state court.

### III. *Summary Judgment*

#### A. *State Denial as Bar to Federal Grant of Summary Judgment*

■ Prior to removal, the California court denied Prudential's motion for summary judgment. Following removal, Prudential again made a summary judgment motion, which the federal district court granted. We reject Preaseau's contention that the California court's decision barred a later granting of summary judgment by the federal district court.

The Supreme Court has instructed that "once a case has been removed to federal court, it is settled that federal rather than

state law governs the future course of proceedings, notwithstanding state court orders issued prior to the removal." *Granny Goose Foods, Inc. v. Teamsters,* 415 U.S. 423, 437, 94 S.Ct. 1113, 1123, 39 L.Ed.2d 435 (1974). We have also held that "[t]he federal rules apply after removal and [t]he federal court . . . treats everything that occurred in the state court as if it had taken place in federal court." *Butner v. Neustadter,* 324 F.2d 783, 785 (9th Cir. 1963) (footnote omitted).

In *Castner v. First National Bank of Anchorage,* 278 F.2d 376 (9th Cir. 1960), we wrote:

> We are concerned here with a second [federal] judge to whom a case has been assigned after a motion to dismiss the complaint and a motion for summary judgment have been denied by a prior [federal] judge . . . . He is charged with the responsibility of conducting the trial to its conclusion. Yet after examination of the record he is firmly convinced that an error of law has been committed in denying the motions. . .
>
> Under such circumstances, we feel that there is no abuse of discretion in overruling the prior judge. The second judge must conscientiously carry out his judicial function . . . . He is not doing this if he permits what he believes to be a prior erroneous ruling to control the case. He can settle the questions presently without compelling the parties to proceed with what may be a futile and expensive trial. We think that these are cogent reasons and exceptional circumstances which justify a departure from the rule of comity within the permissible limits of judicial discretion.

*Id.* at 380; *see United States v. Desert Gold Mining Co.,* 433 F.2d 713, 715 (9th Cir. 1970). This practice reflects the rule that an order denying a motion for summary judgment is generally interlocutory and "subject to reconsideration by the court at

---

**3.** Especially in light of *Haight* and *Grigg,* we do not believe that Prudential's waiting until the day of trial or any other conduct of Prudential

constituted a "waiver" of Prudential's right to seek removal as provided for in applicable law.

any time." *Dessar v. Bank of America National Trust and Savings Association*, 353 F.2d 468, 470 (9th Cir. 1965) (footnote omitted).[4]

Recognizing that federal procedures govern a removed action and that we are to treat the state court's denial of summary judgment "as if it had taken place in federal court," *Castner* and its progeny indicate that the federal court, within its discretion and for "cogent" reasons, could grant summary judgment notwithstanding the earlier denial by the state court. We do not believe that the district court abused its discretion here, particularly in light of the correctness of its legal conclusion. *See* part III C *infra*.

### B. *Standard of Review for Summary Judgment*

This court has recently written:

Summary judgment may be granted " 'only where there is no genuine issue of any material fact or where viewing the evidence . . . in the light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter of law.' " *Caplan v. Roberts*, 506 F.2d 1039, 1042 (9th Cir. 1974).

*Loya v. Immigration & Naturalization Service*, 583 F.2d 1110, 1111 (9th Cir. 1978). The district court held that "there is no genuine issue as to any material fact, that insurance coverage under both group policies had terminated prior to the insured's death, and that the defendant is entitled to judgment as a matter of law . . . ." We agree.[5]

### C. *Coverage Under the Personal Accident Policy*

■ Section 10209 of the California Insurance Code provides in relevant part:

[T]he policy shall contain a provision that the insurer will issue to the employer for delivery to the insured employee an individual certificate setting forth:

. . . .

(b) A provision that if the employment terminates for any reason whatsoever and the employee applies to the insurer within 31 days after such termination, paying the premium applicable to the class of risk to which he belongs and to the form and amount of the policy at his then attained age, he is entitled, without producing evidence of insurability, to the issue by the insurer of any individual life policy in any one of the forms, other than term insurance, customarily issued by the insurer.

. . . .

(d) A provision that if the employee dies during the 31-day period within which he is entitled to have an individual policy issued to him in accordance with this section and before any such policy shall have become effective, the amount of life insurance which the employee is entitled to have issued to him under such individual policy shall be payable as a claim under the group policy, whether or not application for the individual policy or the payment of the first premium therefor has been made.

If any employee insured under a group life insurance policy delivered in this state becomes entitled under the terms of such policy to have an individual policy of life insurance issued to him without evidence of insurability, subject to making an application and payment of the first premium within the period specified in such policy, and if such employee is not given notice of the existence of such right at least 15 days prior to the expiration date of such period, then, in such event the employee shall have an additional period within which to exercise such right, but nothing herein contained shall be con-

---

4. The California courts operate under a similar rule. Under California law, "[a]n order denying the motion for [summary judgment] is not a final judgment and not res judicata. Hence, a subsequent motion for summary judgment may be made and granted." 4 B. Witkin, California Procedure § 195, at 2842 (2d ed. 1971).

5. The question of Preaseau's rights under the Term Life Policy is not before this court and we thus express no opinion as to that matter.

strued to continue any insurance beyond the period provided in such policy. This additional period shall expire 25 days next after the employee is given such notice but in no event shall such additional period extend beyond 60 days next after the expiration date of the period provided in such policy.

The parties agree that § 10209 applies to Preaseau's insurance coverage. They also agree that the notice spoken of in the second paragraph of (d) was not given Preaseau. The parties, however, dispute the proper interpretation of the second paragraph of (d), a question of first impression in this and the California courts. Appellant argues that the second paragraph of (d) means that both the option for extending coverage and the entitlement to benefits is extended for 91 days when proper notice is not given. Because Jesse Preaseau died 90 days after leaving his job, Billie Preaseau concludes that she is entitled to benefits. Prudential counters that (d) extends the option for converting coverage to 91 days, but does not extend the period of entitlement to benefits beyond 31 days.

This court has noted that "[t]he language of a statute is the best and most reliable index of its meaning, and where the language is clear and unequivocal it is determinative of its construction." *Monte Vista Lodge v. Guardian Life Insurance Co.*, 384 F.2d 126, 128 (9th Cir. 1967), *cert. denied*, 390 U.S. 950, 88 S.Ct. 1041, 19 L.Ed.2d 1142 (1968). The California courts subscribe to a similar rule. *See Palos Verdes Faculty v. Palos Verdes Peninsula Unified School District*, 21 Cal.3d 650, 659, 147 Cal.Rptr. 359, 363, 580 P.2d 1155, 1159 (1978). We believe that the statutory language clearly indicates that the failure to give proper notice provides the insured with an additional 25 to 60 days during which to exercise the option to convert to individual coverage, but does not otherwise extend the entitlement to benefits.

Subsection (b) of § 10209 grants an employee covered by group insurance an option of 31 days to convert to individual coverage without producing evidence of insurability. The first paragraph of (d) specifies that if the employee dies within the 31 day period, he is still entitled to insurance benefits.

The second paragraph of (d) must be construed as extending the option period of (b) and not the coverage period of the first paragraph of (d). First, the second paragraph begins by referring to the condition of (b): "If any employee . . . becomes entitled . . . to have an individual policy of life insurance issued to him without evidence of insurability." Second, the section refers to "such right," meaning the right to obtain individual coverage without producing evidence of insurability. Third, the paragraph refers to the "exercise [of] such right," a phrase that would apply to the exercise of the option to convert involved in (b), but would not relate to the obtaining of benefits under the first paragraph of (d). Finally, the second paragraph of (d) is devoid of any language similar to the language in the first paragraph of (d) extending the period of coverage. In short, the language of the second paragraph of (d) indicates that it was written to supplement (b), dealing with the option to convert to individual insurance, and not to extend the coverage period provided in the first paragraph of (d).

The proviso to the second paragraph of (d) further compels this reading. It provides: "nothing herein contained shall be construed to continue any insurance beyond the period provided in such policy." This proviso must be read as meaning that the legislature did not intend the second paragraph to extend the period of coverage; rather it extends only the time limit on the option to convert.[6]

6. Preaseau writes of the proviso: "This language obviously exists to reach the question where there are collateral benefits flowing from a group of certificates, such as extended death benefits during total disability . . . ." The proviso, however, speaks of "any insurance" and Preaseau does not explain why the legislature used such general language if it meant only some portions of a person's insurance coverage.

Our reading is further reinforced by the cases and commentaries that have discussed this issue. They have typically distinguished between the option to convert to individual coverage and the continued entitlement to benefits under the policy. They have also determined that an extension of the time limit for conversion does not in itself provide an extension of the entitlement for benefits. *See Aetna Life Insurance Co. v. Catchings*, 75 F.2d 628, 629 (5th Cir. 1935); *Juhl v. John Hancock Mutual Life Insurance Co.*, 107 Cal.App.2d 188, 236 P.2d 628, 629 (1951)[7]; 1 J. Appleman & J. Appleman, Insurance Law and Practice § 125, at 183 (1965) (noting California law); 19 Couch on Insurance 2d § 82.93, at 1049–50 (2d ed. 1968) (noting California law); Annot., 68 A.L.R.2d 8, 116 (1959). Moreover, courts that have construed provisions very similar to § 10209(d) have read them as extending the option to convert, but not the entitlement to benefits. *See Frank v. Sentry Life Insurance Co.*, 526 P.2d 1146, 1149 (Okl.1974); *Wells v. Wilbur B. Driver Co.*, 121 N.J.Super. 185, 296 A.2d 352, 357–

58 (1972).[8] We conclude that § 10209(d) did not extend Preaseau's entitlement to benefits for 91 days.

Appellant responds that this simple reading of § 10209 ignores the legislative history underlying (d).[9] She notes that in *Juhl v. John Hancock Mutual Life Insurance Co.*, the California Court of Appeal held that the then-existing statutory provisions provided a 31 day option to convert to individual coverage, but did not extend the entitlement to benefits. Two years later the California legislature added the first paragraph of (d). Then in 1967 the California Supreme Court concluded that the 31 day option period could not begin running until the employee was sufficiently notified of his final termination. *Walker v. Occidental Life Insurance Co.*, 67 Cal.2d 518, 63 Cal. Rptr. 45, 432 P.2d 741 (1967). Shortly thereafter the legislature added the second paragraph of (d). Claiming that a court should presume that the legislature was aware of relevant judicial decisions when it amended a statute, Preaseau argues that in

---

**7.** For a more complete discussion of *Juhl*, see pp. 82–83 *infra*.

**8.** Preaseau seeks to distinguish these cases on four bases. First, she argues that because legislative goals may differ from state to state, these cases are not entitled to great weight. This is of course always a difficulty when employing precedent from another jurisdiction. But to the degree that these cases interpret provisions like § 10209 as we interpret § 10209 today, they offer some support for our reading.

Second, Preaseau argues that the interpretation of the conversion provision was dictum in *Wells* because the court there found another basis for entitlement to the contested insurance. Without seeking to determine whether *Wells* would bind New Jersey courts in later cases, it is sufficient to note that the ruling provides support for our reading today, especially as Preaseau cannot offer case support for her interpretation, whether in dicta or otherwise.

Third, Preaseau argues that because *Wells* relied upon the California *Juhl* decision and because the legislature in effect overruled *Juhl* by subsequent legislation, *Wells* is not good authority. As discussed *infra*, we believe Preaseau misreads the legislative history *vis-a-vis Juhl*.

Finally, Preaseau argues that because *Wells* is not good authority and because *Frank* relied on *Wells*, *Frank* is also without effect. We

reiterate that while neither case is decisive, and of course neither case is controlling, we believe they offer some additional support for our reading of § 10209, particularly in view of Preaseau's failure to produce contrary authority.

**9.** Preaseau first notes that the state court refused to grant summary judgment. She reads this as meaning that the state court accepted her reading of § 10209. She contends that because the issue here is one of interpreting state law, we should defer to the state court's "decision."

We do not believe that we may simply defer to the state court's "decision." First, we cannot be assured that the state court refused summary judgment because it agreed with Preaseau's reading of § 10209. Second, as we noted in *Castner v. First National Bank of Anchorage*, 278 F.2d 376, 380 (9th Cir. 1960), we would not "conscientiously carry out [our] judicial function" were we simply to defer to the state court's purported "decision" without determining what we consider to be the proper interpretation of the statute. Finally, under the *Erie* doctrine this court has an independent duty to interpret and apply state law in accordance with applicable state precedent. *See Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78–80, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

adding the second paragraph of (d), the legislature must have intended to overturn *Juhl* by providing that entitlement to benefits as well as the option to convert coverage was extended to 91 days.

The language of the first paragraph of (d) manifests the legislature's reaction to *Juhl*: it expressly and directly overturns *Juhl* as to the 31 day period. But the second paragraph of (d) does not contain any language indicating that it was intended to overturn *Juhl* as to a 91 day period. We cannot infer that every provision enacted by the legislature following *Juhl* was intended to modify *Juhl*. Moreover, the legislature's use of specific language in the first paragraph of (d) to change the *Juhl* result as to a 31 day period manifests that the state legislature appreciated how to modify expressly that decision when it wished. The legislature's failure to use that or similar language in the second paragraph of (d) thus indicates that it did not conceive of the second paragraph as modifying *Juhl*. Finally, *Walker* dealt with the proper time limit on the option to convert as provided in (b). That the second paragraph of (d) was enacted shortly after the *Walker* interpretation of (b) suggests that the legislature meant to react to the Supreme Court's interpretation of (b)—the right to convert—and not to the first paragraph of (d)—the continuation of benefits—which was not even an issue in *Walker*. In short, to the degree that any conclusion can be reached from the legislative history, it would seem to be that the second paragraph of (d) was intended to deal with the option to convert and not to extend the entitlement to benefits.[10]

AFFIRMED.

---

**10.** Preaseau also cites the following language from the group "Employee Term Life Insurance" master policy and certificate:

> B. DEATH BENEFIT DURING CONVERSION PERIOD.
> This benefit is payable if the Employee dies within thirty-one days after he ceased to be a covered individual and while entitled (under Section D) to a conversion of his insurance under this Coverage to an individual policy.

Preaseau argues that because § 10209(d) extends the option to convert to 91 days, the contractual provision above was also extended to 91 days.

The group master policy and personal certificate for the "Personal Accident Insurance" did not include the quoted language. The propriety of Prudential's payments under the Term Life Insurance policy is not now before this court. Preaseau offers no persuasive argument indicating why the provisions of the Term Life Insurance policy contract should be incorporated into the Personal Accident Insurance policy; indeed, her brief fails to acknowledge that the quoted provision appears in the Term Life Insurance policy, but not the contested Personal Accident Insurance policy. Thus the significance of the quoted language given § 10209 does not directly affect resolution of the issue of entitlement to benefits under the Personal Accident Insurance policy.