## COURTAULDS AEROSPACE, INC.

v.

## William C. HUFFMAN, et al.

### No. CV–F–91–518 OWW.

United States District Court,
E.D. California,
Fresno Division.

June 17, 1993.

---

James Arthur Bruen, Mariah Baird, Landels Ripley and Diamond, San Francisco, CA, for Connell Ltd. Partnership.

Jeffrey David Dintzer, Joel Steven Moskowitz, Gibson Dunn and Crutcher, Los Angeles, CA, for Courtaulds Aerospace, Inc.

Lisa L. Oberg, Steven L. Hoch, Haight Brown and Bonesteel, Santa Monica, CA.

William J. King, Engrstrom Lipscomb and Lack, Los Angeles, CA.

Michael Jens F. Smith, Jory Peterson and Sagaser, Fresno, CA, for Veatech Elec. Service of Taft, Inc.

Nelson E. Brestoff, Lisa J. Morelli, Radcliff Rose and Randsen, Los Angeles, CA, for Augustine Metals, Inc.

Kenneth Zommick, Simon McKinsey Miller Zommick Sandor and Dundas, Long Beach, CA, for G. Harris Intern.

Gene Tanaka, Best Best and Krieger, Riverside, CA, for Riverside Scrap Iron & Metal Corp.

William M. Sarnoff, Law Offices of William M. Sarnoff, Los Angeles, CA.

Kathleen Jacobs, Jacobs and Gregory, Riverside, CA.

Steven James Banner, Burns Ammirato Palumbo Milam and Baronian, Pasadena, CA.

Edward G. Operini, Law Offices of Gerald Lundberg, Victorville, CA.

Kaye E. Tucker, Tucker and Baum, Beverly Hills, CA.

Richard D. Gorman, Gerstl and Gorman, Monterey, CA.

Michael Quesnel, Mitchell Silberberg and Knupp, Los Angeles, CA.

Paul Dean Bangor Jr., Spensley Horn Jubas and Lubitz, Los Angeles, CA.

Jason R. Walsh, Jacobs and Gregory, Riverside, CA.

Dale Dorfmeier, Borton Petrini and Conron, Fresno, CA, for William C. Huffman.

Kenneth A. Ehrlich, Reznik and Reznik, Sherman Oaks, CA, for John Curry, dba United Surplus Iron & Metals.

Timothy D. McCollum, McCollum and Bunch, Fresno, CA.

Aaron Rosen, Law Office of Aaron Rosen, Beverly Hills, CA.

Gerald R. Lundberg, Law Offices of Gerald Lunberg, Victorville, CA.

Steven R. Friedman, Law Offices of Steven Friedman, Beverly Hills, CA, for Airways Metals & Refining Co.

Rafael Bernardino Jr., Law Office of Rafael Bernardino Jr., Los Angeles, CA.

Jan Ann Harris Aniel, Los Angeles, CA, for Bank of America.

Daren T. Johnson, LaFollette Johnson DeHaas and Fesler, Los Angeles, CA.

Michael J. Halloran, Office of General Council, San Francisco, CA.

## MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WANGER, District Judge.

Defendants Augustine Metals, Inc.; D & L Metals, Inc.; So Cal Metal; Mid–City Iron & Metal Corp.; Alpert & Alpert Iron & Metal, Inc.; Barstow Truck Parts & Equipment Co., Inc.; Kramer Metals; A & S Metals; Sierra Iron & Metal Co., Inc.; and, Interstate Non–Ferrous Corp., have filed a motion seeking summary judgment as to Plaintiff's Second Amended Complaint.[1] The motion has been joined by the following defendants: G. Harris International, Inc.; Steinmeyer Corp. dba Silver Steel & Metals Co.; Airways Metals & Refining Co.; Connell Limited Partnership, as successor-in-interest to Luria Brothers & Company, Inc.; John Curry, dba United Surplus Iron & Metals; Riverside Scrap Iron & Metal Corp.; and, Veatech Electric Service of Taft, Inc.

The motion is opposed by plaintiff Courtaulds Aerospace, Inc.; defendant William C. Huffman; and defendant and cross-complainant Bank of America.

## I. BACKGROUND

The complaint of plaintiff Courtaulds Aerospace, Inc. alleges the following facts: Plaintiff is the owner of 150 acres of land in Mojave, California (the "Premises"). The land was previously owned by Bank of America. Defendant William C. Huffman owns approximately 12 acres just east of the Premises, on which he has operated a metal smelting plant (the "Plant"), Mobile Smelting Company, from 1961 to the present.

The California Environmental Protection Agency ("Cal–EPA") determined that pollution from the Plant had contaminated the Premises with dioxin, lead, copper, and other heavy metals in hazardous concentrations. Cal–EPA required Courtaulds to conduct a remedial/removal preliminary assessment of the contamination of the Premises. Substantial cleanup costs are expected to be incurred by Courtaulds in the future.

All defendants other than Huffman and Bank of America, including the "Moving Defendants" (i.e., all defendants joining in the motion for summary judgment), owned plastic-insulated copper wire, which they contracted with Mr. Huffman to have burned and smelted. The purpose of this process was to burn off the plastic to salvage the copper. The burning of the plastic produced ash which contained hazardous substances. The ash was disposed of and released at the Plant and was carried by the wind, thereby contaminating the Premises.

Plaintiff contends three forms of ash were created. "Furnace ash" was created by burning the insulation off the wire. Huffman would scrape this ash out of a catch basin and put it in piles on the ground or in drums. Exhaust from the incineration process would be channeled through a pipe into a "baghouse." This "baghouse ash" would be collected in burlap bags which were stored or removed by a commercial hazardous waste handler. As the baghouse process was not completely efficient, remaining waste in the form of ash and gas would be vented through a smokestack. Plaintiff additionally alleges

---

1. The motion was also filed on behalf of San Fernando Motors, Inc. At hearing, defense counsel represented that this entity withdrew from the motion.

that from 1965 to 1972, Huffman burned copper wire on the ground without any emissions controls whatsoever.

Plaintiff has filed the declaration of an environmental engineer, Robert Glenn Stillman. Stillman believes the contamination of the Premises that occurred after 1972 was caused by the wind carrying two types of ash: the furnace ash that was left in piles, and ash (and gas) emitted from the smoke stack during the incineration process.

On February 18, 1993, Moving Defendants' motion to dismiss Plaintiff's first amended complaint was denied. The Court's memorandum opinion stated:

> [T]he parties have not cited any case in which a defendant is accused of being an arranger because it: 1) delivered non-hazardous materials to a facility for the sole purpose of removing a hazardous substance and 2) retained ownership of at least the non-waste product of that process. The parties only cite cases in which the defendant delivered hazardous substances to the processor,[2] or the defendant divested itself of complete ownership at the time it delivered the then non-hazardous item to the processor/buyer.[3]
>
> It is not necessary to decide whether liability attaches for merely delivering non-hazardous substances, however. The complaint alleges that the Moving Defendants *retained ownership of the ash* throughout the reclamation process. [footnote deleted] It alleges that the ash is a hazardous substance. It further alleges that the Moving Defendants contracted with Mr. Huffman to dispose of that ash. Plaintiff has alleged a viable claim under section 9607(a)(3) as interpreted in *Jones–Hamilton Co. v. Beazer Materials & Materials,* 973 F.2d 688 (9th Cir.1992) and *United States v. Aceto Agr. Chemical Corp.,* 872 F.2d 1373 (8th Cir.1989).
>
> While denying that they own the ash, the Moving Defendants have provided no

authority which holds, as a matter of law, they could *not* have owned it. The Moving Defendants complain that Plaintiff has not presented any proof of an agreement. This is a question of fact.

Memorandum Opinion, February 18, 1993, at 8–10.

No party suggests the existence of any new case law but Moving Defendants assert, based on the deposition testimony of William Huffman, that there is no factual dispute as to their liability under CERCLA because: (1) they had no contract, agreement, understanding, or arrangement with Huffman to dispose of the ash; and (2) they did not own or possess the ash when Huffman, alone and for his own account, decided what to do with it.

## II. STANDARDS FOR REVIEWING A MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 252–56, 106 S.Ct. 2505, 2512–14, 91 L.Ed.2d 202 (1986). The non-moving party cannot simply rest on its allegation without any significant probative evidence tending to support the complaint. *Id.* at 249, 106 S.Ct. at 2510–11. Evidence submitted in support of or in opposition to a motion for summary judgment must be admissible under rules governing admission of evidence generally. *Hal Roach Studios, Inc. v. Rich-*

---

2. *See, e.g., Jones–Hamilton Co. v. Beazer Materials & Materials,* 973 F.2d 688 (9th Cir.1992); and *United States v. Aceto Agr. Chemicals Corp.,* 872 F.2d 1373 (8th Cir.1989).

3. *See, e.g., Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313 (11th Cir.1990);

*Edward Hines Lumber Co. v. Vulcan Materials Co.,* 685 F.Supp. 651 (N.D.Ill.1988); and *State of California v. Summer del Caribe, Inc.,* No. CV–89–3754 SAW, 1992 WL 487930 (N.D.Cal. June 30, 1992).

*ard Feiner & Co., Inc.,* 883 F.2d 1429, 1437 (9th Cir.1989).

■ The more implausible the claim or defense asserted by the opposing party, the more persuasive its evidence must be to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Nevertheless, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor." *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513. The Court's role on summary judgment is not to weigh the evidence, *i.e.,* issue resolution, but rather it is issue finding. *Id.*

### III. LIABILITY UNDER CERCLA

■ Under section 107 of CERCLA, four classes of persons are strictly liable for releases of hazardous substances: (1) current owners and operators of a facility where hazardous substances were disposed; (2) past owners or operators who owned or operated the facility at the time of disposal; (3) transporters of the hazardous substances, and; (4) persons who arranged for disposal or treatment at any facility containing such substances.

■ Plaintiffs allege the Moving Defendants fall into the fourth class, commonly known as "arrangers." Section 9607(a)(3) creates strict liability for:

> any person who by *contract, agreement, or otherwise arranged for disposal or treatment,* or arranged with a transporter for transport for disposal or treatment, of *hazardous substances* owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances ...

(emphasis added). CERCLA does not define the term "arranged." CERCLA provides that "disposal" shall have the meaning provided in the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*[4] RCRA defines "disposal" as:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters.

42 U.S.C. § 6903(3). The Ninth Circuit has held that "disposal for purposes of section [9607(a)(3) ] refer[s] only to the affirmative act of discarding a substance as waste, and not to the productive use of the substance." *3550 Stevens Creek Associates v. Barclays Bank of California,* 915 F.2d 1355, 1362 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991). Thus, the owner of a building who installed insulation which contained asbestos was not liable because he did not discard the asbestos, but put it to a productive use. *Id.*

### IV. DISCUSSION

Preliminarily, Plaintiff informs the Court of a change in the status of a case relied on by Moving Defendants in their motion to dismiss and discussed in the Court's February 18, 1993 opinion, *State of California v. Summer del Caribe, Inc.,* No. CV–89–3754 SAW, 1992 WL 487930 (N.D.Cal.). *Summer del Caribe* involved a manufacturer of metal cans which sold "solder dross," a byproduct of its production process and a hazardous material, to a reclamation facility. The reclamation facility melted down the dross, sold the reusable portion to third parties and placed the unusable portion in drums. When the drums leaked, the reclamation facility was forced to perform a CERCLA cleanup and it sued the can manufacturer for indemnification. The court found that the can manufacturer was not liable as an arranger because the solder dross was not a hazardous substance, as it was not a solid waste, because the can manufacturer did not discard it, but sold it to the reclamation facility. The court's holding in *Summer del Caribe* was explained in this Court's memorandum opinion, yet played no part in the determination that the motion to dismiss must be denied.

---

4. RCRA amended the Solid Waste Disposal Act ("SWDA") in 1976. The terms are used interchangeably.

350

*See* Memorandum Opinion, February 18, 1993, at 7.

The Court in *Summer del Caribe* has granted a motion to reconsider and in a very thorough and thoughtful opinion has reversed itself on the issue of whether, under Ninth Circuit law, the term "hazardous substance" as used in CERCLA is to be given the identical meaning as the term "solid waste" as defined in RCRA. 1993 WL 147941 (N.D.Cal. April 14, 1993) at *4–5.

The opinion rejected the defendant's contention that no "treatment" occurred at the reclamation site and that the reclamation site, alone, was responsible for the "disposal." Treatment occurred when the reclamation process "changed the physical character of the solder dross and allowed [the reclamation facility] to recover the reusable portion." *Id.* at *5. "Disposal" occurred when the reclamation facility buried the remaining unusable material. The *Summer del Caribe* court also found that the defendant can manufacturer was liable as an "arranger" under CERCLA. *Id.* at *5–6.

Moving Defendants argue that the opinion upon reconsideration in *Summer del Caribe* is easily distinguished. This is correct to the extent that *Summer del Caribe* does not answer the question of whether liability under CERCLA attaches to a party that delivers non-hazardous materials to a reclamation site. Nor is its holding binding in this case.

**A. *Evidence of a Contract, Agreement, or Arrangement between Moving Defendants and Huffman Regarding Disposal of the Ash***

Moving Defendants allege that they cannot be liable as "arrangers" because the deposition of Mr. Huffman demonstrates that they did not enter into a "contract, agreement, or otherwise arranged" for Huffman to "dispose" of the ash, even if they "owned or possessed" it.

Moving Defendants suggest that the Ninth Circuit in *Jones–Hamilton* narrowly construed the requirement that a contract, agreement or arrangement for disposal exist. *Jones–Hamilton* contains no such restrictive interpretation; the court simply found that

sufficient evidence of such an arrangement existed in the form of a written contract. It did not reach the question of what other forms of arrangement are sufficient to create liability. The plain language of CERCLA ("contract, agreement, or otherwise arranged") belies Moving Defendants' argument that an arrangement need be in the form of a contract or explicit oral agreement. *See Aceto,* 872 F.2d at 1380 ("Congress used broad language in providing for liability for persons who 'by contract, agreement, or *otherwise arranged for*' the disposal of hazardous substances. While the legislative history of CERCLA sheds little light on the intended meaning of this phrase, courts have concluded that a liberal judicial interpretation is consistent with CERCLA's 'overwhelmingly remedial' statutory scheme.").

Huffman's deposition expresses his belief that no written contract explicitly regarding disposal existed. Based on the following colloquy, it is not clear whether Huffman believes any express oral agreements regarding disposal existed:

Q. *In connection with the services that you provided to the customers, the burning of the insulated copper wire, did those services include getting rid of the ash?*

A. *No.*

Mr. Dintzer: I want to make an objection. I believe that has been asked and answered twice in the course of Mr. Huffman's deposition, and it is duplicative.

Ms. Oberg: Join.

THE WITNESS: What do you want?

By Mr. Brestoff:

Q. Okay. That was their objection. What is the answer to the question?

Mr. Banner: I thought he did answer.

The Witness: About 15 or 20 times I would say is about right.

By Mr. Brestoff:

Q. Okay. Well, as I understand, then, it was not included in those services?

A. No. Just like I said, *if he wanted it, he would tell us, you know, that he would take it.* If he had the drums to put it in—sometimes we could buy drums. We would sell them to him for a buck, whatever.

Mr. Dintzer: Can you clarify exactly— can you read back the record as to what the question was and as to what the response, because I'm unclear as to what it exactly was.

(Record read.)

Mr. Dintzer: I want to state a further objection, okay, to the question? I want to object to the previous question that Mr. Huffman just answered as to the meaning of the term "services," because it is unclear exactly what you are talking about there. Are you talking about the service of burning the wire? Are you talking about the service of burning wire and handling the wastes that are generated by that which have obvious expenses that Mr. Huffman testified to? And I don't think the witness is cognizant of all of those factors and elements in quote, unquote, "the service" in answering that response.

Mr. Brestoff: All right. Fair enough.

Q. Let's talk about what those services were, Mr. Huffman. Here is an invoice.

A. All right.

Q. There are lots of these, right, these invoices?

A. Yes.

Q. Now, these invoices were given to the various customers—

A. Yes.

Q. —for certain services that you rendered; right?

A. Let me see that.

(Pause in proceedings.)

The Witness: All right.

By Mr. Brestoff:

Q. Now, we all need to understand what you thought people were paying you for when you rendered those services.

The question is: *What did those services include? They brought you insulated copper wire, and you gave them back copper. Did they—when they paid you for that service, were they also paying you for getting rid of the ash?*

A. *No.*

Mr. Dorfmeier: Hang on a minute.

The Witness: No. There was no—

Ms. Oberg: Bill—

Mr. Dorfmeier: Bill, stop.

Mr. Brestoff: Why are you interrupting him in the middle of his answer?

Mr. Dorfmeier: Because—

Mr. Dintzer: His counsel is allowed to make an objection—

Ms. Oberg: Before the answer.

Mr. Dorfmeier: The objection is to the form of the question. I think there is about three questions in the way you phrased it.

Mr. Brestoff: Did you understand the question, Mr. Huffman?

Mr. Dorfmeier: Well, he's not going to answer it because it is compound, and I don't know what a yes or a no would relate to.

If you want to read back the question again, I will demonstrate—I'm not being difficult here for you.

The Reporter: Would you like it read back?

Mr. Brestoff: No. Let's just keep going.

Mr. Dorfmeier: Okay. I understand the import of your question. I think it is a valid question. I'm not going to object to it, but don't give him two or three questions at a time.

Mr. Brestoff: *All right. Well, now that you know what the scenario is, the real question is: Did the services for which you charged when you sent out an invoice to the customers, did those services include getting rid of the ash?*

Mr. Dintzer: *Objection.*

The Witness: *Sure.*

Mr. Dintzer: I make the same objection as I did before, because I don't think it is clear, and I think there are other ways of getting at the answer to this than asking him—than by using the same term "services."

Ms. Oberg: Could we have the question and the answer read back, please?

Mr. Brestoff: No. I'm going to go on. I'm going to try it a different way. You

can get it in your transcript, but let me just keep going here.

Q. Mr. Huffman, I'm going to show you—

Ms. Oberg: Can I ask one question? I'm sorry to interrupt. May I ask whether or not the reporter got the last answer. I would like to know—there were objections interposed. I'd like to know whether the answer actually got on the record, please.

The Reporter: After this, can we go off the record for 30 seconds?

Mr. Dorfmeier: Yes, let's go off.

Huffman Depo. at 768:19–773:25. On its face, Huffman's testimony is contradictory. He replied both "no" and "sure" to similar questions as to whether disposal was part of the services he provided Moving Defendants. It also is unclear whether his understanding as to the services he was providing arose from an explicit or implicit agreement or arrangement.

Moving Defendants contend that in answering "sure," Huffman was not responding to the question posed, but was permitting Mr. Dintzer to state an objection. It cannot be determined from the deposition transcript that Huffman was not responding to the question posed.

It is also impossible to determine from the deposition transcript whether Huffman fully understood the questions posed regarding the term "disposal." He was questioned using terms which have legal significance under CERCLA but different meanings in common usage. For instance, Huffman seemed confused, even after explanation, that "dumping" the ash could include acts beyond hauling it to a dump site. *See* Huffman Depo. at 785:3–789:3. When asked if oral understandings or contracts existed to dump the ash, if the term "dump" is interpreted to mean "being cast in the wind," Huffman replied:

I would have to say that a little bit different than that.

I never had any arrangements or contracts with anybody to dump any hazardous or any ashes on anybody's property. If the wind blew it over there, I could not stop it, because the wind blows sometimes 200 miles an hour out there.

Huffman Depo. at 788:22–789:3. It is unclear whether Huffman meant that no agreement existed in which Moving Defendants allowed Huffman to dispose of the ash by letting it blow away (whether from the smokestack or from the piles of furnace ash).

Even if Huffman's testimony is read as denying the existence of any express contract or agreement, there is evidence that Huffman believed an implicit arrangement existed between Moving Defendants and Huffman as to disposal of the waste.

The following passages are illustrative:

Mr. Brestoff: Let me start again.

Q. At any time, okay just so it is clear, and I'm talking about the furnace ash that resulted from the burning of the insulated copper wire, after the ash was created as a result of your process, to your understanding, who did you think owned the ash?

Mr. Dintzer: My objection as to relevancy stands.

Ms. Oberg: I have an additional objection that under the circumstances of the case, and the factual scenario here, that it may call for the witness to reach a legal conclusion.

Go ahead.

The Witness: There would be no way to know who belonged to it until the copper was weighed and put back on his truck, and if he didn't have much room or he didn't want stuff, he would just drive away. And if he didn't want it, that's okay. Other guys would take it. We didn't care. If he wanted it, fine. If he didn't want it, we would get rid of it. Maybe we would get $5 a ton, so what the heck, it was like buying it. Pick up a 20–ton load at $5 a ton is a 100 bucks.

Huffman Depo. at 766:4–767:3. Additionally:

Q. [By Mr. Brestoff] All right. Let me try—here is the question. While you were in business and dealing with A & S Metals all the way down the same list, Sierra Iron & Metals Company, did you ever think that it was implied or just part and parcel of the ash that was produced as a result of cleaning off their copper wire?

A. Not necessarily, but I think that word "implied" almost takes care of it. They would just—if they didn't take it with them, they knew that I would find a home for it. Because if he had 500 pounds of ashes, what good is it going to do him? The guy that buys that, if he haven't got a truckload, he doesn't want to talk to you. He isn't going to fool around with 500 pounds.

Huffman Depo. at 796:15–797:6.

Moving Defendants argue that they disclaimed any responsibility for the ash by allowing Huffman to keep it and sell it if he could. Yet, as in the sale situation involved in *Summer del Caribe*, Moving Defendants' agreement with Huffman was "accomplished to get rid of" the plastic insulation by means of its incineration. Whether the transaction is viewed as one to reclaim copper or to remove the plastic insulation, the Moving Defendants intended to separate valuable metal from unwanted insulation via incineration.

Moving Defendants do not contest that they knew ash was being created and that in most cases they took no steps to remove it. Plaintiff alleges that in the one deposition of a principal of the Moving Defendants which it has conducted, Robert Thomas Wilheim, president of Interstate Non–Ferrous Corp., stated that he observed insulated wire being burned at the facility and saw smoke rising in the air. It cannot be said as a matter of law that the transactions between Huffman and the scrap owners were simply for reclamation purposes rather than arrangements for disposal. "[C]ourts have not hesitated to look beyond defendants' characterizations to determine whether a transaction in fact involves an arrangements for the disposal of a hazardous substance." *Aceto,* 872 F.2d at 1381.

Whether the Moving Defendants intended the ash to be a gift to Huffman, a sale to Huffman, or the rendering of a service by Huffman in disposing of something Moving Defendants did not want, "[t]he dispositive inquiry is whether [the defendants] intended to otherwise dispose of hazardous waste." *Summer del Caribe,* at *6. By leaving the

ash with Huffman, Moving Defendants rid themselves of the ash.

As did the can manufacturer in *Summer del Caribe,* Moving Defendants had three options: to not reclaim the copper and thus not create a hazardous waste; to reclaim the copper and dispose of the ash themselves; or, to contract with Huffman to reclaim the copper wire and through some arrangement have him dispose of the ash. No liability attaches under the first option. If the ash were disposed of improperly, liability clearly attaches under the second. It cannot be said, as a matter of law, that by shifting the task of disposal to Huffman under the third option, no liability attaches to the Moving Defendants. Avoidance of such inconsistent outcomes is the purpose of the "arranger" language in the statute. As the Eighth Circuit stated in *Aceto,* "Any other decision, under the circumstances of this case, would allow defendants to simply 'close their eyes' to the method of disposal of their hazardous substances, a result contrary to the policies underlying CERCLA." 872 F.2d at 1382. *See also New York v. General Electric Co.,* 592 F.Supp. 291, 297 (N.D.N.Y.1984) ("[P]ersons cannot escape liability by 'contracting away' their responsibility or alleging that the incident was caused by the act or omission of a third party").

Besides their unsupported argument that liability only accrues on the basis of an express agreement or contract, Moving Defendants overly discount evidence of an implied agreement for disposal. They cite the holding in *Stevens Creek* that "disposal for purposes of section [9607(a)(3) ] refer[s] only to the affirmative act of discarding a substance as waste, and not to the productive use of the substance." 915 F.2d at 1362. They note Huffman's testimony that he sometimes sold the ash for $5 a ton, and argue that, by allowing Huffman to keep the ash (whether his keeping the ash is viewed as a gift or a sale), they were not discarding the ash but putting it to a productive use.

This argument fails for several reasons, the most obvious of which is that Plaintiff is not alleging that harm was done to its land by the ash which was sold but by the ash which was allowed to blow away (whether

from smokestack exhaust or the piles of furnace ash which Huffman allowed to accumulate). No productive use existed when ash was allowed to escape into the air. Secondly, as the court in *Summer del Caribe* held in rejecting a similar argument:

> the "sale of a useful product" defense applies when the sale is of a new product, manufactured specifically for the purpose of sale, or of a product that remains useful for its normal purpose in its existing state. In contrast, the courts have consistently rejected the "sale of a useful product" defense when the purpose of the sale is to get rid of or treat a waste or by-product.

*Summer del Caribe*, at *6. Finally, in the Moving Defendants' role as "arrangers," the proper inquiry is not whether *their* act in leaving the ash amounts to a "disposal," but whether *Huffman's* act in allowing the ash to be scattered by the wind amounts to a disposal. "Courts have held defendants 'arranged for' disposal of wastes at a particular site even when defendants did not know the substances would be deposited at that site or in fact believed they would be deposited elsewhere." *Aceto*, 872 F.2d at 1381. As the court in *Summer del Caribe* held, disposal did not occur when the can manufacturer sold the solder dross to the reclamation facility, but when the reclamation facility buried the drums of unusable dross. *Summer del Caribe*, at *6.

### B. *Evidence as to Ownership of the Ash*

Moving Defendants argue that summary judgment must also be granted because Huffman's deposition demonstrates that there is no factual basis for the assertion that they retained ownership of the ash during the reclamation process. They contend that they could not have arranged for disposal since they never had control or possession of the ash.

There is sufficient evidence in the deposition transcript to rebut Moving Defendants' contention:

Q. [By Mr. Brestoff] Okay. Did they ever tell you to dispose of it?

A. Sure. I mean, they just told me—sure. Do what you want.

Q. In other words, it was yours?

A. They gave it to me.

Mr. Dintzer: I object. That misstates—

The Witness: *It was theirs until they gave it to me.*

Huffman Depo. 762:15–24. Additionally:

Q. [By Mr. Brestoff] At any time, okay, just so it is clear, and I'm talking about the furnace ash that resulted from the burning of the insulated copper wire, after the ash was created as a result of your process, to your understanding, who did you think owned the ash?

Mr. Dintzer: My objection as to relevancy stands.

Ms. Oberg: I have an additional objection that under the circumstances of the case, and the factual scenario here, that it may call for the witness to reach a legal conclusion.

Go ahead.

The Witness: *There would be no way to know who belonged to it until the copper was weighed and put back on his truck,* and if he didn't have much room or he didn't want stuff, he would just drive away. And if he didn't want it, that's okay. Other guys would take it. We didn't care. If he wanted it, fine. If he didn't want it, we would get rid of it. Maybe we would get $5 a ton, so what the heck, *it was like buying it.* Pick up a 20–ton load at $5 a ton is a 100 bucks.

Huffman Depo. at 766:5–767:3. Huffman's statements can be fairly interpreted as meaning that the scrap dealers owned the ash at least until the time they gave or sold it to him.

Moving Defendants' allegation only applies to furnace ash. Moving Defendants provide no authority for the proposition that, at the moment of incineration, the ash contained in the smoke came under the possession and control of Huffman, while they retained ownership of the wire.

### V. CONCLUSION

In post-argument submissions, the parties disagree whether Moving Defendants' motion should be dismissed with or without "prejudice." While it appears that Moving Defen-

dants can not succeed in obtaining summary judgment solely on the basis of Huffman's ambiguous and contradictory deposition testimony, a moving party may renew a summary judgment motion by showing a different set of facts or a change in law, notwithstanding the denial of an earlier motion. W. Schwarzer, A. Wallace & J. Wagstaffe, *Cal.Prac. Guide: Fed.Civ.Pro. Before Trial* § 14:367 (1992) (*citing Preseau v. Prudential Ins. Co. of America,* 591 F.2d 74 (9th Cir.1979)).

Moving Defendants' Motion for Summary Judgment is DENIED.

SO ORDERED.